**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 4:25-CR-93-1** |
| | ) | |
| **BRANDON MITCHELL KELLEY** | ) | |

# DEFENDANTS' JOINT MOTION FOR AN EVIDENTIARY HEARING AND TO DISMISS FOR THE DESTRUCTION OF EXCULPATORY SURVEILLANCE FOOTAGE

Defendants Brandon and Stacey Kelley move for a hearing to determine the cause of the destruction of an exculpatory video recording, and dismissal in the event the destruction violated their right to due process.

In its Indictment, the Government charges Mrs. and Mr. Kelley with ignoring or failing to recognize that their premature infant daughter Vyolet needed emergency care. Doc. 3. But the Government's own hospital, Winn Army Community Hospital, did not treat the infant's condition as an emergency for 47 minutes after she arrived to the emergency room, according to surveillance footage recorded during that period. Tr. of Admin. Separation Bd. Proceedings re SPC Brandon

M. Kelley (Mar. 2 & 6, 2026) (Ex. A) at 8-29; *see id.* at 14, 16-18;[1] Winn Army Community Hospital Coordination Report (Nov. 22, 2024) (Ex. B) at 1.

On the night of Vyolet's death, an Army CID agent had the hospital's security supervisor review the recording of Vyolet dying in the hospital's waiting room. Ex. B at 1. The CID agent used it to determine the check-in and triage times, and tried to determine when Mr. Kelley arrived. *Id.* The CID agent watched the recording himself. Ex. A at 14, 16. Three days later, CID sent the hospital a written request for a copy of the recording. Ex. A at 16-17. The hospital's security office received that request but never acted on it, and the Army preserved no copy of the footage. Ex. A at 16-18.

The video was the only objective account of Vyolet's visible condition, her parents' conduct, the hospital staff's observations, and

[1]Exhibit A is a copy of the summarized transcript provided to defense counsel by the Government as a Word document. The Government provided copy was unpaginated. Undersigned counsel added page numbers to permit accurate citation and made no other changes. Counsel notes that the board reporter prepared a summarized rather than a verbatim transcript (Ex. A at 7), and that the Government possesses but, despite repeated requests, has not produced the audio recording of the proceeding.

the hospital's response during the 47 minutes between check-in and triage. Those facts bear directly on the Government's claim that a lay parent recognized, or culpably failed to recognize, a medical emergency that trained personnel did not treat as one.

At Specialist Kelley's Army administrative separation board on March 2, 2026, the CID agent, Special Agent Otilio Rivera, testified that he personally viewed the recording, that Special Agent Christopher Dowling submitted a written request for it, that the request reached the hospital's Chief of Security, and that Winn's security team saw the request and simply never filled it. Ex. A at 14, 16-18. Those facts convert the question presented from an unexplained loss into a documented request that a federal custodian disregarded. The Court should conduct an evidentiary hearing, order production of the request and destruction records, and preclude the Government from presenting a one-sided account of events that its own unpreserved recording would have resolved.

Mr. and Mrs. Kelley then request dismissal of the Indictment if a hearing establishes a due process violation.

## BACKGROUND

### I. Vyolet waited 47 minutes before Winn took her from the waiting room to the emergency room.

Stacey "Katt" Kelley brought Vyolet to the emergency department at Winn Army Community Hospital on November 22, 2024. Brandon drove them and then left. Interview of Stacey Kelley and Reenactment (Nov. 25, 2024) (Ex. C) at 2; IA Review of Wal-Mart Footage (Nov. 22, 2024) (Ex. D) at 1. Felicia Tyler, a medical support assistant at the reception window, checked Mrs. Kelley and Vyolet in at 6:18 p.m. Mrs. Kelley wrote "1820" as the arrival time on the intake form she completed at the window. Ex. B at 1; Coordination with WACH II – Intake Form (Nov. 25, 2024) (Ex. E) at encl. a. Nurse Stuckey took Vyolet back to the emergency room at 7:05 p.m. Ex. B at 1. Mrs. Kelley later told CID that she remained in the waiting room "for approximately 45 minutes before the intake nurse noticed that V/KELLEY was distressed." Ex. C at 2. The contemporaneous video fixed the interval at 47 minutes. Ex. A at 15.

The government's own records do not agree on the amount of time Vyolet waited for care. Agent Rivera testified that the notes he wrote after watching the recording, filed at enclosure 9b, record a "40 minute

wait" ending at 1855, ten minutes earlier than the 1905 triage time Captain Crosson took from the same footage. Ex. A at 14-16; Ex. E at encl. b. Asked at the separation board to account for the discrepancy, Agent Rivera could not, and attributed his own "30 to 40 minutes" estimate in part to what Mrs. Kelley had told him rather than to what he had seen. Ex. A at 16 ("That is the time that she has been telling us, 30 to 40 minutes."). The recording is the only source that could have settled the interval, and it no longer exists.

During Vyolet's arrival into the emergency room after her 47-minute wait, an ambulance crew was already responding to Winn for another patient. For that patient, the ambulance was notified at 7:00 p.m., responded at 7:02, and arrived at 7:05. V-Kelley's EMS Run Report (Nov. 22, 2024) (Ex. F) at 1. Dr. Hodgeman then "requested to have V/KELLEY transported instead." Ex. F at 1. After Winn staff unsuccessfully attempted intravenous and intraosseous access in both tibias, Vyolet was placed in a car seat for transport. *Id.* The ambulance reached Memorial at 8:41 p.m. *Id.*

## II. CID had Winn review the recording during the death investigation.

Army CID agents began investigating that night. At about 10:24 p.m., Special Agent Nathan Ivey coordinated with Captain Daniel Crosson, Winn's Supervisory Security Guard. At CID's request, Crosson reviewed the emergency-department surveillance recording. Ex. B at 1. Ivey reported Crosson's findings:

> CROSSON verified through WACH CCTV Footage that TYLER checked in S. KELLEY and V/KELLEY at 1818 and STUCKEY took V/KELLEY back to the emergency room at 1905. Attempts to verify when B. KELLEY arrived to WACH were unsuccessful.

*Id.* So, before the recording was lost, CID knew that it covered the relevant place and period, proved the timing of check-in and triage, and included Brandon's arrival. CID incorporated the review into its investigative file—not as relevant to the hospital staff's failure to recognize Vyolet's condition, but as evidence to be used against Mr. and Mrs. Kelley. *Id.* The report does not preserve what the camera showed about Vyolet's appearance, her parents' demeanor, staff attention (and inattention), or activity in the waiting room. *Id.*

## III. CID requested the recording on November 25, 2024; Winn's security office received the request, never filled it, and the recording was gone when CID went back for it.

The chronology of the request is now established by sworn testimony. Agent Rivera testified at the separation board that a request for the footage was submitted and that he had watched the footage himself before it was lost:

> Defense: Is there a video of that?
>
> SA Rivera: There was, a request was put in. I did observe the video, and I do recall what exactly had happened from remembrance of it, sir.
>
> Defense: Where's that video now?
>
> SA Rivera: That video was not properly obtained by the security. We put a request in, and when we asked for it, it was no longer available.

Ex. A at 14.

Agent Rivera identified the date, the sender, and the office to which the request was directed: "We made a request on the 25th of November, 2024 at 1338, Special Agent Dowling made the request to the Winn Army ER supervisor." Ex. A at 17. He identified the recipient of the email as "Chief Sid Nichols, Chief of Security." Ex. A at 18. Elsewhere in the same examination, Agent Rivera testified that he and

Agent Dowling put a request in on the day they viewed the footage, November 22, which, if accurate, would mean the hold was requested the night of Vyolet's death. Ex. A at 16 ("I took notes that day after we observed the video footage. We put a video request in that day.") Whether there were one or two requests, both dates precede the loss.

Agent Rivera then explained why the recording does not exist. Winn's security office had the request in hand and did nothing with it:

> SA Rivera: . . . when we put the requests in at the hospital security system, and when we went to go to retrieve it, it was no longer available. They never burned the CD in this [sic]. When they tried to go back in the system to get a copy it was no longer available.
>
> * * *
>
> Defense: Did they explain why the video was not available?
>
> SA Rivera: They saw the email request sent in but never fulfilled it. When they tried to go back into the systems located, it was no longer available.

Ex. A at 16-18.

This is not a case in which routine overwriting outran an investigation. The request was made, received, and abandoned. No one copied the file, no disc was produced, and the office that let the request

lapse was the same security office that had reviewed the footage for CID three days earlier—employed by the same staff that allowed a dying infant to wait for 47 minutes before receiving care that could have saved her life. Ex. B; Ex. A at 16-18.

Agent Rivera could not say when he learned the recording was unavailable: asked directly, he answered, "I do not recall." Ex. A at 17. The interval between the November 25 request and the discovery of the loss is therefore unknown, as is whether anyone at CID followed up during it. However, the paperwork exists and has never been produced. Asked whether the request forms and the result of the request were in the defense's discovery folders, Agent Rivera answered: "No one asked for it but I can provide it in the Teams." Ex. A at 17. The Government has thus confirmed that it holds documents recording its own preservation request and Winn's failure to honor it, and that it has not disclosed them. Yet the retention interval, the applicable litigation-hold policy, nor the date the data became unrecoverable appears anywhere in discovery produced to date.

## IV. The only person who watched the recording is the case agent, and his account is incomplete, partly derived from Mrs. Kelley's statements, and interpreted as adverse to the defense.

The loss of the footage has left the Government's case agent as the sole narrator of a recording no one else can check. Agent Rivera did not watch the whole recording but rather "skimmed it through until a nurse approached [Vyolet] and took her to the back." Ex. A at 16. He could not say from the footage whether Mrs. Kelley was completing the intake form: "I remember she came in, she checked in and she sat down. I couldn't see if she was filling out anything." Ex. A at 16.

Agent Rivera nevertheless offered the separation board a characterization of Mrs. Kelley's demeanor drawn from the unavailable recording; "She was sitting down, she wasn't in a panic," while acknowledging in the same examination that his sense of the waiting period came after he "skimmed" the video and in part from interpreting what Mrs. Kelley told him. Ex. A at 16, 18. That is the precise danger a remedy must address: the Government cannot lose the objective record of the waiting room and then invite a jury to accept its agent's selective recollection of what that record showed about a defendant's conduct.

Nor did CID develop the subject any other way. Agent Rivera testified that he never spoke to a Winn receptionist, never asked anyone at Winn why a critically ill infant waited for so long, and never interviewed Dr. Hodgeman, the emergency-department physician who treated Vyolet. Ex. A at 19, 26. He confirmed that the investigation is closed and that nothing remains outstanding. Ex. A at 22-23. The 47 minutes were recorded once, by a camera the Government controlled, examined by no one else, and investigated no further.

## V. CID preserved comparable video from private facilities and businesses.

Five days after Vyolet's death, Agent Rivera obtained surveillance video from Memorial Health University Medical Center, a private hospital. He noted that the first production had no timestamp. Investigative Summary: Memorial Medical Center Video Footage of 22 Nov 24 (Ex. G). Eighty days later, he returned and obtained fourteen timestamped files, including emergency-room lobby footage. Investigative Summary: Memorial Medical Center Footage II (Feb. 10, 2025) (Ex. H) at 1.

Thirty-one days after Vyolet's death, agents obtained Wal-Mart surveillance video on a compact disc, documented it on Evidence

Custody Document MJ3UK, and submitted it to the CID evidence custodian. Ex. D. Agent Rivera reconciled the store clock to actual time and reported: “The actual time PV2 KELLEY exit’s [sic] the store is 22 Nov 24 at 1842.” *Id.* at 1.

## VI. The witness accounts do not replace the recording.

Winn employees are Government witnesses to the period the camera recorded. Their accounts do not reproduce an objective, continuous view of what Vyolet looked like, who observed her, what the staff did, or how the parents acted. The need for the objective video recording is illustrated by the existing chronology. Nurse Foreman reportedly placed treatment between about 7:05 and 10:02 p.m. and stated that Vyolet was placed in the ambulance and “coded” at 10:02. Ex. B at 2. The EMS record places the ambulance at Winn at 7:05, respiratory arrest at 8:01, and arrival at Memorial at 8:41. V-Kelley's EMS Run Report (Nov. 22, 2024) (Ex. F) at 1.

The board testimony confirms how thin any substitutes for the video are. Dr. Matthew Fults, the chief of pediatrics on whom the Government relies to neutralize the delay, testified that his knowledge of the wait is hearsay; “I can only tell you what I heard as hearsay,” and

put it at "about a 30 to 40 minute wait." Ex. A at 34. He had no involvement with the front desk and declined to opine on triage protocols. Ex. A at 33-34. Dr. Joshua Dejong, the pediatrician who first treated Vyolet, never saw her in the waiting room at all, and testified that had he seen her there he "would have brought her back right away." Ex. A at 40. Asked whether the interval mattered, he allowed that "the 47 minutes could have made a difference. It could have[.]" Ex. A at 51. On the central question of what was visibly apparent in that waiting room, every Government witness is either reasoning from hearsay or was not there. The camera was.

## ARGUMENT

### I. Controlling law requires constitutional materiality and bad faith.

In this Circuit, a defendant claiming a due-process violation from lost or destroyed evidence must show that the evidence was "likely to significantly contribute to his defense." *United States v. Wilchcombe*, 838 F.3d 1179, 1191 (11th Cir. 2016) (quoting *United States v. Revolorio-Ramo*, 468 F.3d 771, 774 (11th Cir. 2006) (citations omitted)). Constitutional materiality requires evidence whose exculpatory value was apparent before destruction and for which comparable evidence is

not reasonably available. *Id.* The Eleventh Circuit also requires the defendant to show bad faith. *Id.* at 1192.

The Supreme Court distinguishes evidence for which the exculpatory value was apparent from evidence that was only potentially useful. *California v. Trombetta*, 467 U.S. 479, 488–89 (1984); *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988). But the practical dispute here is not resolved by a label. *Wilchcombe* asks for both material contribution and bad faith, and Mr. Kelley addresses both.

A preservation request does not conclusively prove either element. *Illinois v. Fisher* rejected the proposition that a pending discovery request eliminates *Youngblood*'s bad-faith requirement for evidence that is only potentially useful. 540 U.S. 544, 548 (2004). But a request made by the investigating agency after it reviewed the evidence is powerful circumstantial proof of knowledge, importance, and preservation duty. The timing and handling of that request must be established at a hearing.

## II. The recording was likely to contribute significantly to the defense.

The video bore on mens rea. The indictment alleges that Mr. Kelley recognized, or culpably failed to recognize, Vyolet's need for

emergency care. Doc. 3. Yet the Government's own chronology shows that trained hospital personnel did not take Vyolet from the waiting room for 47 minutes. Ex. B. What was visible during that interval would help the jury decide whether Vyolet's critical condition was apparent to a lay caregiver and whether Mr. Kelley acted with malice, willfulness, or culpable disregard.

The video's exculpatory value was apparent before destruction. CID reviewed the recording during a death investigation, documented the check-in and triage times, and tried to determine when Mr. Kelley arrived. *Id.* Those are not conjectured uses discovered years later. They are the Government's contemporaneous uses of the video. The case agent then watched the footage himself and wrote notes about the length of the wait, which he filed as an enclosure to his report. Ex. A at 16. And CID did not merely review the recording; it asked Winn in writing to produce a copy three days after the death and while the investigation was open. Ex. A at 16–17. An agency does not send a written request for footage it considers immaterial. The request is the Government's own contemporaneous assessment that this recording mattered.

Comparable evidence is not reasonably available. A chart can state when triage occurred. It cannot show Vyolet's appearance over time, sight lines, staff observation, staff activity, the parents' actions and reactions, or changes in condition. Witnesses can now describe those matters, but they cannot reproduce the recording's objectivity, completeness, or timing. And the witnesses whose memories would substitute for the video are the same employees whose conduct it recorded. *See Trombetta*, 467 U.S. at 489.

Nor does Crosson's summary replace the recording. It preserves three estimated timestamps and one unsuccessful inquiry. Ex. B. It does not preserve the visual facts that matter to the defense theory. Unlike a case in which destroyed evidence merely bolsters an argument still fully available through other proof, this recording would have supplied the only objective account of the 47-minute interval. *Cf. Revolorio-Ramo*, 468 F.3d at 774-75.

## III. Bad faith turns on knowledge and purpose.

Bad faith is defined as more than negligence or incompetent preservation. *Revolorio-Ramo*, 468 F.3d at 775. Its presence "must necessarily turn on the police's knowledge of the exculpatory value of

the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.*. A failure to follow standard preservation procedures is relevant but does not alone establish bad faith. *Davis v. Sellers*, 940 F.3d 1175, 1189 (11th Cir. 2019).

The established facts support an inference of bad faith, and at a minimum require a hearing. CID knew the video existed, knew the period it covered, used it to establish facts, viewed it directly, and incorporated the results into a homicide investigation. Ex. B; Ex. A at 14-18. It then made a written request for the footage on November 25, 2024, directed to the Winn emergency-department supervisor and received by Winn's Chief of Security. Ex. A at 17-18. Winn "saw the email request sent in but never fulfilled it." Ex. A at 18. This is no longer the inadvertent loss of a recording whose value nobody had identified. It is the loss of a recording that the investigating agency had watched, relied on, and asked in writing to have preserved. Moreover, it is a recording that would have revealed medical malpractice.

The record also does not yet foreclose a worse account. Agent Rivera cannot say when CID learned the footage was gone, and the correspondence that would fix the sequence remains in the

Government's hands, undisclosed. Ex. A at 17. Whether Winn's security office deleted, allowed the overwrite of, or simply ignored a recording that documented its own colleagues' handling of a dying infant is a question the Court cannot resolve on the present record.

Civil spoliation cases do not supply the constitutional rule, but the Eleventh Circuit's treatment of post-request destruction is instructive. The court has said it is "highly skeptical" of a claim that evidence was unintentionally destroyed under a routine policy after a preservation request and that "a hands-off implementation of an ordinary corporate destruction policy is not a silver bullet." *Skanska USA Civil Southeast Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1313 (11th Cir. 2023) (quoting *Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1186 (11th Cir. 2020)). The Court should apply *Youngblood*'s criminal standard after determining who knew what, when, and why the video disappeared.

The institutional setting also warrants factual development. *Kyles v. Whitley* extends the Government's disclosure duty to "others acting on the government's behalf in the case." 514 U.S. 419, 437 (1995). Here, Crosson reviewed the recording at CID's request, conveyed investigative facts to CID, and became a source in the investigation. That case-

specific cooperation supports attribution. A hearing should determine whether Crosson or another Winn custodian received CID's preservation request, acted for CID in responding to it, and failed to suspend destruction despite that role.

The same evidence may also establish motive. The recording documented Winn employees' conduct during the 47-minute delay in treating what the government describes as an obviously dying infant, a condition it claims Mr. Kelley should have recognized days earlier. The prosecution thus attributes to Mr. and Mrs. Kelley what trained hospital personnel either failed to recognize or failed to address. If the military hospital acted negligently, the Government agency responsible for preserving the recording was also the agency whose employees the recording could implicate.

## IV. The Court should order production and conduct an evidentiary hearing before selecting a remedy.

A due-process ruling cannot rest on the present gaps, and the Government concedes it can close several of them. The Court should require the United States to produce to Mr. Kelley the November 25, 2024, request transmitted by Special Agent Dowling to the Winn Army emergency-department supervisor and Chief of Security Sid Nichols,

together with any earlier request made on November 22, 2024; all Winn responses and internal correspondence concerning that request; the CID case-file materials Agent Rivera testified he can provide; enclosure 9B and Agent Rivera's contemporaneous notes of his review of the footage; CID communications and notes concerning the footage; audit or access logs for the emergency-department camera system; the applicable CCTV retention and litigation-hold policy; and records identifying when the relevant data became unrecoverable. The Court should also order production of the audio recording of the March 2 and 6, 2026 separation board, which the Government's recorder confirmed the Government possesses and which the defense requested on the record at that hearing and multiple times by email since. The hearing should include testimony from Agent Rivera, Agent Dowling, Agent Ivey, Captain Crosson, Chief Nichols, the Winn security or information-technology custodian, and the emergency-department supervisor to whom the request was addressed.

The sequence now appears to be request first, destruction second. On that sequence, the routine-overwrite explanation is unavailable to the Government because Winn's security office had the hold request

before the data was lost. What remains for the hearing is when the recording actually became unrecoverable, what Winn did between receiving the request and discovering the loss, and whether any retention policy was departed from. The Court should decide those facts before permitting any Government witness to describe the lost recording to the jury.

## V. The remedy should match the findings and the prejudice.

If the Court finds that the Government destroyed exculpatory material in bad faith and that no lesser remedy can provide a fair trial, dismissal is warranted. Dismissal is an extraordinary remedy, but Mr. Kelley reserves the right to request it because the lost recording bore on the case's central question: How could he have recognized days earlier a danger that trained hospital personnel failed to recognize when the child arrived?

If a fair trial remains possible, the most direct remedy is use-specific preclusion. The Government should not be permitted to elicit or argue a selective account of Vyolet's visible condition, her parents' demeanor, staff observation, Mr. Kelley's arrival, or events in the waiting room while the objective record of those subjects is unavailable

because it was destroyed. That preclusion should reach Agent Rivera's recollection of the footage specifically. He skimmed the recording, could not tell what Mrs. Kelley was doing at the reception window, and blended what he saw with what Mrs. Kelley told him, yet he is prepared to characterize her as not "in a panic" on the strength of a recording Mr. Kelley can never review. Ex. A at 18. At minimum, the Court should bar any Government witness from testifying to any fact that could have been proven (or disproven) by the lost video.

Additionally, the Court should give a tailored instruction explaining that the United States had control of, reviewed, and failed to preserve objective video of the relevant period and that the jury may consider that loss when evaluating the Government's proof—with precise language to be litigated following a hearing.

## CONCLUSION

For these reasons, Brandon and Stacey Kelley ask the Court to (1) order the United States to produce the preservation records, related correspondence and system records, Agent Rivera's notes, and the separation-board audio identified above; (2) conduct an evidentiary hearing before trial; and (3) after that hearing, dismiss the indictment if

no lesser remedy can cure the due-process violation or, alternatively, impose appropriate sanctions, including preclusion of testimony or argument about what the recording showed and a tailored remedial instruction.

## EXHIBITS

A. Tr. of Admin. Separation Bd. Proceedings re SPC Brandon M. Kelley (Mar. 2 and 6, 2026).

B. Winn Army Community Hospital Coordination Report (Nov. 22, 2024).

C. Interview of Stacey Kelley and Reenactment (Nov. 25, 2024).

D. IA Review of Wal-Mart Footage (Nov. 22, 2024).

E. Coordination with WACH II – Intake Form (Nov. 25, 2024).

F. V-Kelley's EMS Run Report (Nov. 22, 2024).

G. Investigative Summary: Memorial Medical Center Video Footage of 22 Nov 24 (Dec. 11, 2024).

H. Investigative Summary: Memorial Medical Center Footage II (Feb. 10, 2025).

Respectfully submitted this 24th day of August 2026.

/s/ *Michael A. Schwartz*
MICHAEL A. SCHWARTZ
Georgia Bar No. 966017
/s/ *Karin Kissiah*
KARIN KISSIAH

Georgia Bar No. 263172
New South Law, LLC
1305 Barnard St. #203
Savannah, Ga. 31401
(912) 581-1999
Counsel for Brandon Kelley

/s/ *Thomas A. Withers*
Thomas A. Withers
Georgia Bar No. 772250
8 East Liberty Street
Savannah, Ga. 31401
(912) 447-8400
TWithers@witherslawfirmpc.com
/s/ *Carey Haughwout*
CAREY HAUGHWOUT, ESQ.
Florida Bar No. 375675
400 Executive Center Drive
Suite 201—Executive Center Plaza
West Palm Beach, FL 33401
Telephone: (561) 720-2902
CareySHaughwout@gmail.com
Counsel for Stacey Kelley

## CERTIFICATE OF SERVICE

I certify that I have on this day served the foregoing document on all parties via the notice generated by electronic filing in this Court, this 24th day of August 2026.

/s/ *Michael A. Schwartz*
MICHAEL A. SCHWARTZ
Georgia Bar No. 966017