**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 4:25-CR-93-1** |
| | ) | |
| **BRANDON MITCHELL KELLEY** | ) | |

# MOTION TO SUPPRESS EVIDENCE DERIVED FROM WARRANTLESS SEARCH

Brandon Kelley moves to suppress evidence derived from the November 25, 2024, warrantless search of his home. He requests an evidentiary hearing.

Three days after Brandon and Stacey Kelley's infant daughter died, two Army Criminal Investigation Division agents came to their home on Fort Stewart Military Reservation, Georgia. On that day, Mrs. Kelley was a civilian dependent who was recovering from an emergency caesarean section of the couple's deceased baby, unemployed, without family nearby, and caring for a three-year-old whose welfare had already drawn the authorities' attention. CID Interview Summary of Stacey Kelley, Nov. 22, 2024, at 1 (Ex. A); Rivera Grand Jury Tr., Apr. 2, 2025, 9:20-22, 12:22-24, 21:14-16, 22:17-19, 23:12-19 (Ex. B). The CID agents were investigating the death as a possible homicide. Ex. B at 6:20-25, 29:2-4. They directed Mr. Kelley, then an active-duty soldier, to

leave the house, leaving his civilian wife alone to be questioned. Recorded Interview of Stacey Kelley, Nov. 25, 2024 (Ex. C). The CID agents then told Mrs. Kelley that they had only a few forms to complete, giving her no recorded advice that she had the right to refuse. *Id.* In a single encounter, the CID agents obtained from Mrs. Kelley three signed consents, questioned her, entered and documented the family home, and recorded her performing a reenactment with a doll depicting how her deceased daughter slept, was clothed and changed, and was placed in a car seat. Reenactment Photos and Video (Ex. D).

The Government bears the burden of proving that Mrs. Kelley's consent was an "essentially free and unconstrained choice," not acquiescence to official authority. *United States v. Gonzalez,* 71 F.3d 819, 828–29 (11th Cir. 1996) (quoting *United States v. Garcia,* 890 F.2d 355, 360 (11th Cir.1989)). It cannot carry that burden by pointing to her signature alone.

The Court should examine the entire encounter, including what the CID agents said before seeking consent, what the forms disclosed, when they were signed, whether Mr. Kelley was present or objected, and how the agents used the Government's military authority before and during the encounter.

Mr. Kelley moves to suppress the observations, photographs, recording, reenactment, and all derivative evidence obtained through the November 25, 2024, encounter. He also requests an evidentiary hearing at which the Government must establish the voluntary consent and lawful scope on which it relies.

## FACTS

1. Brandon Kelley re-enlisted in the Army and reported to Fort Stewart on October 18, 2024. Ex. B at 14:16-19, 19:20-21.
2. Then, and at all times relevant to this Motion, Stacey Kelley was a civilian whom CID identified as a dependent spouse. Ex. A; CID Interview Summary of Stacey Kelley, Nov. 25, 2024 (Ex. E).
3. The Kelleys lived off post at a Studio 6 Suites until about October 26, 2024, when they moved into family housing at 7529 Fedala Street, Apartment B, on Fort Stewart. Ex. B at 20:23-21:8. The Government has treated that move as jurisdictionally decisive. Rivera told the Grand Jury that Fort Stewart “is federal territory,” that “on base, federal law applies,” and that the family entered “[f]ederal jurisdiction” when it moved on post. Ex. B at 19:14-17, 21:9-13.

4. Days before the Kelleys had moved to Georgia, Vyolet Kelley was born by emergency caesarean section on October 2, 2024. Ex. E; Ex. B at 10:14, 10:25-11:1. On November 4, 2024, Stacey Kelley sought treatment at Winn Army Community Hospital for complications from the surgery. Her physicians restricted her from lifting and directed that Brandon Kelley be placed on quarters to care for her. Ex. B at 22:17-19, 23:12-19. Mr. Kelley remained on quarters through November 22. Ex. B at 23:20-24:7.

5. Mrs. Kelley was unemployed. Ex. B at 21:14-16. She had no family nearby and told Agent Rivera that both of her parents were dead. Ex. B 12:22-24.

6. At about 10:22 p.m. on November 22, Rivera and SA Christopher Dowling interviewed Stacey Kelley in the pediatric emergency department at Memorial Medical Center, where Vyolet had been pronounced dead earlier that evening. Ex. B at 28:9-10. A Winn nurse had reported "possible signs of neglect," and Rivera was investigating the death as a potential homicide. Ex. B at 6:20-25, 29:2-4. The interview report records no advice of rights. Ex. A.

7. Three days later, at about 2:00 p.m. on November 25, 2024, Rivera and SA Nathan Ivey went to the Kelleys' residence and

interviewed Stacey Kelley there. Ex. E. During that encounter, Mrs. Kelley signed three forms: a consent to search the residence, a consent to search Memorial Medical Center records, and a consent to search Mayo Clinic records from the hospital of Vyolet's birth. Ex. E at 3 (listing encls. d-f). She also agreed to be recorded reenacting how Vyolet slept, was clothed and changed, and was placed in a car seat. Ex. E at 2.

8. Before obtaining Mrs. Kelley's signature, the CID agents removed Mr. Kelley from the house. Audio Recording of Nov. 25, 2024, Interview of Stacey Kelley, 1:45-3:40 (Ex. C). They explained that, as a servicemember, Mr. Kelley had rights that his civilian wife did not, making her easier to question. *Id.* At the outset, and then again about twenty-five minutes into the interview, the agents mentioned that they had some "forms" for her to complete. *Id.* But they presented no forms. *Id.* Instead, they continued questioning the postpartum, post-surgical mother about her infant's symptoms during the seventy-two hours before her death, even asking whether any of Mrs. Kelley's other children had died. *Id.* By the end, Mrs. Kelley was sobbing and said that she wanted to get it over with "so we can stop doing this." *Id.* Only then did the agents

present a pre-completed "Consent to Search" form. *Id.* Mrs. Kelley asked to find her husband. What happened after that is unrecorded.

Government recordings reveal no advice of rights to Mrs. Kelley or any indication that she could refuse the search. *Id.* at 1-3. Records omit what the agents said before obtaining her signature; when the form for consent to search the residence was signed relative to entry, questioning, photography, and the reenactment; or whether consent was limited. *Id.*

## ARGUMENT

### I. The Government must prove a voluntary, authorized, and properly limited consent.

The home stands at the Fourth Amendment's core. *Payton v. New York*, 445 U.S. 573, 590 (1980). A warrantless home search is presumptively unreasonable, and the Government bears the burden of establishing an exception. *United States v. Tovar-Rico*, 61 F.3d 1529, 1536 (11th Cir. 1995). Consent is one such exception but applies only when the Government proves that consent existed and that it "was not a function of acquiescence to a claim of lawful authority" and was freely and voluntarily given. *United States v. Yeary,* 740 F.3d 569, 581 (11th Cir. 2014).

Voluntariness is a fact question governed by the totality of the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973). Relevant considerations include coercive procedures, the person's cooperation, awareness of the right to refuse, education and intelligence, and belief about whether incriminating evidence will be found. *United States v. Blake*, 888 F.2d 795, 798–99 (11th Cir. 1989). No factor works alone, but official coercion is disqualifying: "Where there is coercion, there cannot be consent," *Bumper v. North Carolina,* 391 U.S. 543, 550 (1968), and a signature cannot convert submission into choice. *See United States v. Bushay*, 859 F. Supp. 2d 1335, 1369-70 (N.D. Ga. 2012) (written forms did not establish voluntary consent when their timing and surrounding circumstances were uncertain).

## II. The record does not establish a free choice; it establishes submission within an unusually coercive Governmental relationship.

The Court must evaluate the person and the setting together. *Schneckloth*, 412 U.S. at 226. Here, both were extraordinary. Mrs. Kelley had lost her infant three days earlier. She was recovering from emergency surgery and had recently needed her husband placed on quarters because she could not lift. She was unemployed, had no nearby family, and had lost both parents. She remained responsible for a three-

year-old who was on the verge of being removed from her care by child-protective authorities. This was Mrs. Kelley's state when two CID agents then came to the government-owned home she occupied only because her junior-enlisted husband was an active-duty soldier. And she knew the agents as homicide investigators, as she had been subject to their questioning at the hospital on the night of her daughter's death.

The military setting did not strip a resident spouse of her ordinary authority over the couple's home. But it gave the agents institutional leverage absent from an ordinary knock-and-talk, and they displayed that authority at the outset. They ordered Mr. Kelley, the servicemember whose status brought them to the home, to leave because he had rights they did not want to address. The same Government controlled the family's access to the installation, provided their quarters, employed its wage earner, commanded his movements, investigated the death, and coordinated with the agency responsible for the surviving child. In that setting, a civilian dependent could reasonably understand CID's request as a direction from the institution on which her shelter, access, income, and family stability depended.

That inference must be tested against the encounter itself. *Bumper* holds that the Government cannot prove consent through

"acquiescence to a claim of lawful authority." 391 U.S. at 549. The Eleventh Circuit likewise asks whether officers used their position to demand compliance rather than request a choice. *Tovar-Rico*, 61 F.3d at 1535-36. The absence of a right-to-refuse warning is not independently dispositive, *Schneckloth*, 412 U.S. at 248-49, but it is nevertheless an important part of the totality, particularly where the person's vulnerability and relationship to official power made a request sound compulsory. *See id*. at 226-27; *Blake*, 888 F.2d at 798-99. On the present record, the Government has not shown voluntary choices.

The later warrant practice confirms that CID knew how to distinguish consent from legal compulsion. In March of 2025, agents obtained judicial warrants before searching the same residence and deliberately planned how to remove the Kelleys during the search. Affidavit in Support of an Application Under Rule 41 for a Warrant to Search and Seize, at ¶ 41 (Ex. F). Records of the November 25, 2024, search, however, identifies no warrant, commander authorization, exigency, or other independent authority. The Government must therefore prove that the November 25 search rested on an actual choice, not on the coercive force of the setting it created.

## III. Stacey Kelley's common authority over shared areas does not answer whether CID could rely on consent obtained after directing Mr. Kelley to leave.

Mr. Kelley does not argue that his wife lacked authority merely because the housing entitlement derived from his military status or because she may not have been the lessee of record. Common authority rests on "mutual use" and "joint access or control for most purposes," not formal title. *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). A resident spouse ordinarily may consent to a search of shared areas when the other occupant is absent and does not object. *See United States v. Thomas*, 818 F.3d 1230, 1241-42 (11th Cir. 2016).

The ordinary absent-co-occupant rule does not end the inquiry because the Government created Mr. Kelley's absence before seeking his wife's consent. When co-occupants are both present and one expressly refuses consent, the other occupant's permission does not make a warrantless search reasonable as to the objector. *Georgia v. Randolph*, 547 U.S. 103, 106, 120-23 (2006). Although Mr. Kelley's present objection is not established on this record, *Randolph* expressly reserved the materially related circumstance in which "the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection." *Id.* at 121. *Fernandez v. California* later explained that this reservation does not turn on an officer's subjective motive: a co-occupant's consent remains effective when the potential objector was removed for an "objectively reasonable" purpose, such as a lawful arrest or the protection of an apparent domestic-violence victim. 571 U.S. 292, 300-03 (2014). Conversely, *Fernandez* preserved *Randolph*'s concern where the removal itself lacks an objectively reasonable, independent justification. *Id.* at 302-03.

The present record requires an evidentiary hearing under that standard. Before requesting Mrs. Kelley's signature, CID agents directed Mr. Kelley, who was then inside his own home, to leave and explained that his status as a servicemember gave him rights his civilian wife did not, making her easier to question. Ex. C at 1:45-3:40. The existing record identifies no arrest, safety concern, military necessity, or other independent reason for excluding him from the encounter. Nor does it establish whether Mr. Kelley objected, was told that CID intended to search the home, or remained available when Mrs. Kelley later asked to find him. *Id.* The Government therefore must explain both the authority under which CID directed Mr. Kelley to leave and the objectively reasonable purpose, independent of obtaining unopposed consent, that required his exclusion.

The absence of any apparent reason to exclude Mr. Kelley also bears directly on whether Mrs. Kelley's consent was voluntary. By directing her husband to leave before questioning her and presenting the consent form, the agents left Mrs. Kelley alone with two CID investigators at an exceptionally vulnerable time. That isolation formed part of the circumstances in which she was asked to authorize the search. Thus, even apart from whether Mr. Kelley's exclusion affected her authority to consent, the Court must consider how the agents created and used his absence in deciding whether Mrs. Kelley made a free and unconstrained choice.

Authority and voluntariness are separate requirements. *Matlock* itself describes the Government's burden as proof of "voluntary consent" by a person with common authority. 415 U.S. at 169. A person who shares access has the legal capacity to choose; coercion overcomes the ability to make that choice. Thus Mr. Kelley invokes his own Fourth Amendment interest in his home and argues that the Government never obtained valid permission to enter or search it.

## IV. Even a voluntary consent reached only shared places and effects within Stacey Kelley's actual or reasonably apparent authority.

The Government must prove not only voluntary consent but authority over each place or effect searched. *Matlock*, 415 U.S. at 170–71 & n.7. Apparent authority suffices only if the facts available to the agents would cause a person of reasonable caution to believe that authority existed; ambiguous circumstances require further inquiry. *Illinois v. Rodriguez,* 497 U.S. 177, 188-89 (1990).

A general consent to search a residence does not automatically extend to closed spaces or personal effects under another occupant's exclusive control. The Government must therefore identify what agents examined or documented, correlate each location or item with the language of the signed form, and prove Stacey Kelley's actual or apparent common authority over it. Any gaming equipment, footlocker, duffel, locked container, electronic device, papers, or other exclusively controlled property falls outside third-party consent unless the Government proves shared access or a reasonable basis for believing it existed.

## V. The Court should suppress the direct and derivative fruits of the invalid encounter.

The exclusionary rule reaches evidence obtained through a warrantless home search and its fruits. *Wong Sun v. United States,* 371 U.S. 471, 484-88 (1963). Here, those fruits include the agents' observations inside the residence, photographs, information recorded on the sudden-unexpected-infant-death form, the November 25 interview and reenactment recorded in the home, and any later evidence obtained by exploiting those materials. Ex.A at 2-3 & encls. a–g.

The Government bears the burden of showing attenuation, an independent source, or inevitable discovery for any evidence it contends is untainted. It cannot meet that burden merely by pointing to the March 2025 warrants, which came four months later; whether they were genuinely independent depends on whether their affidavits used information learned during the November encounter. The Court should require the Government to identify each derivative use and establish an untainted source before admitting it into evidence.

## REQUEST FOR RELIEF

Mr. Kelley respectfully asks the Court to hold an evidentiary hearing and require the Government to prove that Mrs. Kelley voluntarily consented to the November 25, 2024, search and that the

agents remained within the scope of that consent. After the hearing, Mr. Kelley asks the Court to suppress:

1. all observations, photographs, recordings, statements, reenactment evidence, and other evidence obtained during the November 25 encounter;
2. any evidence obtained from a place or item outside the scope of Mrs. Kelley's consent or her actual or apparent authority; and
3. all evidence later derived from the unlawful search.

Mr. Kelley also requests any further relief the Court deems appropriate.

**EXHIBITS**

**A.** CID Interview Summary of Stacey Kelley, Nov. 22, 2024

**B.** Rivera Grand Jury Tr., Apr. 2, 2025

**C.** Recorded Interview of Stacey Kelley, Nov. 25, 2024

**D.** Reenactment Photos and Video

**E.** CID Interview Summary of Stacey Kelley, Nov. 25, 2024

**F.** Affidavit in Support of an Application Under Rule 41 for a Warrant to Search and Seize, Mar. 18, 2025

Respectfully submitted this 24th day of August 2026.

/s/ *Michael A. Schwartz*
MICHAEL A. SCHWARTZ
Georgia Bar No. 966017
/s/ *Karin Kissiah*
KARIN KISSIAH
Georgia Bar No. 263172
New South Law, LLC
1305 Barnard St. #203
Savannah, Ga. 31401
(912) 581-1999
Counsel for Brandon Kelley

**CERTIFICATE OF SERVICE**

I certify that I have on this day served the foregoing document on all parties via the notice generated by electronic filing in this Court, this 24th day of August 2026.

/s/ *Michael A. Schwartz*
MICHAEL A. SCHWARTZ
Georgia Bar No. 966017