**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 4:25-CR-93-1** |
| | ) | |
| **BRANDON MITCHELL KELLEY** | ) | |

# BRANDON KELLEY'S MOTION TO SUPPRESS STATEMENTS

Defendant Brandon Kelley moves to suppress statements taken from him by Army investigators on March 19 and August 8, 2025. He requests an evidentiary hearing.

## SUMMARY

This motion presents two distinct but related constitutional defects arising from CID's interrogations of Mr. Kelley on March 19 and August 8, 2025.[1] On March 19, Mr. Kelley appeared at CID pursuant to

[1] At a May 2026 Army hearing regarding Mr. Kelley's administrative separation, CID Agent Rivera suggested that Mr. Kelley had made statements prior to March 19, 2025. "Summary of Proceedings" at 15 ("Yes sir, I did not talk to Brandon at all before the day he was arrested, he wanted to talk to me. Other agents had spoken to him before then. They did Brandon's initial interview sometime between January and March of 2025.") Then, at CID's interrogation of Mr. Kelley on August 8, 2025, a CID agent implied that Mr. Kelley had made statements to agents on more than one prior occasion (March 19). Ex. C. Undersigned counsel has not identified in discovery any notice of statements by Mr. Kelley other than those made March 19 and August 8, 2025. If Mr. Kelley made statements in addition to the March 19 and August 8 statements at issue in this motion, he requests the opportunity to move to suppress those statements in the future under *Missouri v. Seibert*, 542 U.S. 600 (2004), or other controlling authority.

an order from his military command and was questioned as a suspect in his daughter's death. On August 8, armed agents arrested him, transported him to a secured interrogation room, and questioned him while he remained in custody. Before each interrogation, CID agents advised Mr. Kelley of his rights under Article 31 of the Uniform Code of Military Justice. Video file produced in discovery titled "Interview of B. KELLEY, 19 Mar 25" (Ex. A); video file produced in discovery titled "Interview of B. KELLEY, 8 Aug 25" (Ex. C). On both occasions, Mr. Kelley indicated that he would answer the agents' questions and signed a form reflecting his apparent assent. "Rights Waiver of B. Kelley, 19 Mar 25" (Ex. B); "B. Kelley's Rights Form, 8 Aug 25" (Ex. D).

Those circumstances present two separate questions. The first is whether Mr. Kelley validly waived his rights, including whether his apparent assent was the product of a free and voluntary choice and whether, given his manifest confusion and limited comprehension, he knowingly and intelligently understood the rights he was abandoning. The second is whether CID's exercise of military and custodial authority, considered together with Mr. Kelley's particular vulnerabilities, overbore his will and rendered his ensuing statements

involuntary. The validity of a rights waiver and the voluntariness of the resulting statements are analytically distinct inquiries. Here, Mr. Kelley did not understand that he could refuse to answer CID's questions, and CID's coercive conduct created and reinforced his belief that he had no choice but to submit to interrogation. The Government must therefore establish both that Mr. Kelley validly waived his rights and that his ensuing statements were voluntary. Because it cannot satisfy either burden, the statements from both interrogations should be suppressed.

## FACTS

1. Brandon Kelley enlisted in the Army in 2018 and was discharged in July 2020 under AR 635-200, Chapter 13, for unsatisfactory performance, with a service characterization of "Discharge Under Honorable Conditions (General)." DD214 blocks 23-28 (Ex. E).

2. Mr. Kelley reentered the Army and received orders directing him to report for duty at Fort Stewart, Georgia, as a Private Second Class. U.S. Army Orders, Brandon M. Kelley (Nov. 5, 2024, effective Oct. 7, 2024). (Ex. F). He remained on active duty into July 2026, after an administrative separation board convened at Fort Stewart

recommended him for separation based on the conduct alleged in the Indictment he faces in this instant matter. *See* Exhibit A to Defendants' Joint Motion for an Evidentiary Hearing and to Dismiss for the Destruction of Exculpatory Surveillance Footage, Aug. 24, 2026. At every time relevant to this motion, Mr. Kelley was subject to the Uniform Code of Military Justice.

3. Mr. Kelley's daughter Vyolet Kelley died on November 22, 2024. Search Warrant Package for Cellphones, Affidavit in Support of an Application Under Fed. R. Crim. P. 41 for a Warrant to Search and Seize, In re Cellphones of Brandon Kelley & Stacey Kelley, No. 4:25-MJ-25-CLR (S.D. Ga. Mar. 18, 2025) (Ex. G at ¶ 5). Army CID investigated her death as a homicide. *Id.*

4. On March 14 and March 18, 2025, the Government obtained sealed federal search warrants for Mr. Kelley's vehicle and cellphone. Search Warrant Package for Vehicle (Ex. H); Search Warrant Package for Cellphone (Ex. G). The supporting affidavits told the magistrate judge how CID intended to obtain Mr. Kelley's phone "in an operation to be conducted during the week of March 17, 2025 . . . commenc[ing] with

B. KELLEY being directed by his command to report to a DACID building on Fort Stewart.” Ex. G at ¶ 41.

5. On March 19, 2025, at CID’s orchestration and direction, Mr. Kelley’s command directed him to report to CID. There, agents advised Mr. Kelley of his legal rights for the offense of murder. Ex. B. During a half-hour of rapport building, Mr. Kelley stated, among other things, his belief that a cellphone battery will swell and explode if the phone is plugged in for more than eight hours (Ex. A at 25:50); exhibited confusion between the words “advocate” and “adamant” (Ex. A at 35:10); admitted his inability to spell the city of his birth, Pasadena, Texas (Ex. A at 37:30); and stated that his eye color varies with his mood and turns darker red when he is mad (Ex. A at 38:30).

6. When asked if he was willing to answers the CID agents’ questions, he stated that he would circle “I do” on the rights advisement form, then elaborated with a nonsensical explanation suggesting that he did not at all understand what he was being asked to consent to. Ex. A at 48:40. Agents nonetheless proceeded with their interrogation.

7. During the interview, according to the Government’s summary, Mr. Kelley: acknowledged he was aware of the discharge instructions

the hospital gave for Vyolet's care; admitted that neither he nor Mrs. Kelley took Vyolet to a pediatrician immediately as the discharge paperwork directed; stated he first noticed Vyolet's decline the Monday before her emergency-room visit; stated that Mrs. Kelley asked to take Vyolet to the emergency room that Monday and that he told her to wait; described his daily routine of playing video games for up to nine hours a day; stated he rarely helped feed Vyolet; and stated that he believed the family's failure to follow the discharge instructions caused Vyolet's death. CID Investigative Summary "Exhibit 40," Mar. 19, 2025 (Ex. I).

8. In the same encounter, Mr. Kelley "provided consent to conduct a full file extraction of his cell phone," which agents seized. Ex. I; Ex. A at 4:24:15.

9. Then, on August 8, 2025, CID agents interrogated Mr. Kelley following his arrest. Taken into custody by armed CID agents wearing uniforms bearing the words "military police," Mr. Kelley was escorted to an interrogation room with the blinds drawn and the door window covered where, through a physically intrusive and verbally aggressive process, his handcuffs were removed. So aware of the custody and control the agents had over him, Mr. Kelley felt the need to ask

permission to adjust his jeans pockets after agents had pulled them inside out. Ex. C at 2:20.

10. Mr. Kelley remained detained in the interrogation room until two physically imposing CID agents wearing CID uniforms entered the room and literally cornered him as they began their interrogation in a physically aggressive posture. Ex. C.

11. Before questioning began, one CID agent presented Mr. Kelley with a form on which he could waive his Article 31 rights in writing. Showing the same lack of sophistication he had demonstrated previously, Mr. Kelley began to sign his rights away before even reading the form. Ex. C at 42:16; Ex. D. He then proceeded to answer the agents' questions.

## ARGUMENT

The Government must demonstrate by a preponderance of evidence that Mr. Kelley's statements to CID were knowing, intelligent, and voluntary. *Colorado v. Connelly*, 479 U.S. 157 (1986); *Jackson v. Denno*, 378 U.S. 368 (1964). Mr. Kelley is entitled to an evidentiary hearing because he alleges facts that, if proven true, would indicate the involuntariness of his statements. *United States v. Francisco-Gutierrez*,

249 F. App'x 135, 141 (11th Cir. 2007) (citing *Jackson v. Denno,* 378 U.S. at 380). Given those allegations, an evidentiary hearing "is constitutionally mandated for a defendant who timely urges that his confession is inadmissible because not voluntarily given." *Id.* (quoting *United States v. Davidson,* 768 F.2d 1266, 1270 (11th Cir. 1985)).

Mr. Kelley's statements to CID on March 19 and August 8, 2025, were involuntary because he did not believe he had any option but to answer his interrogators' questions, and this subjective belief was the result of coercive interrogation techniques.

The Eleventh Circuit evaluates the validity of a *Miranda* waiver under a two-prong totality test. The waiver must be voluntary, and the waiver must be knowing and intelligent. *United States v. Ransfer*, 749 F.3d 914 (11th Cir. 2014). The relinquishment of the right must have been voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and it must have been made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Hastings*, No. 519CR00153LCBJHE1, 2019 WL 5086781, at *4 (N.D. Ala. Aug. 16, 2019), report and recommendation

adopted, No. 519CR0153LCBJHE1, 2019 WL 5089843 (N.D. Ala. Oct. 10, 2019) (quoting *United States v. Lall*, 607 F.3d 1277, 1283 (11th Cir. 2010)).

"Although proving a voluntary, knowing, and intelligent waiver 'entails the proving of a person's subjective state of mind,' the court relies on 'the objective indicia of a defendant's mental state.'" *Id.* (quoting *United States v. Sonderup*, 639 F.2d 294, 297 (5th Cir. March 13, 1981)).

To suppress an involuntary statement, the involuntariness must be the result of coercive Government conduct. *Connelly*, 479 U.S. at 164 ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."). But "it is axiomatic that '[w]here there is coercion, there cannot be consent.'" *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)), *abrogated on other grounds by Arizona v. Gant,* 556 U.S. 332 (2009).

### A. The March 19 statements, as a result of Government coercion, were neither voluntary nor knowing and intelligent.

On March 19, 2025, Mr. Kelley was only months into his second chance at an Army career, after his first chance ended due to "unsatisfactory performance." Ex. E. Immediately upon reenlistment, his infant daughter had died, and his son had been removed from his and Mrs. Kelley's custody. It was clear that his career was hanging by a thread.

On this landscape, Mr. Kelley's command ordered him to a CID building for interrogation. It would not have been unreasonable for him to believe that refusing to cooperate could have spelled the end of his Army career, which he had resurrected because he had been unable to earn sufficient income as a civilian. So he went, and he talked without hesitation.

The interrogation began with approximately 30 minutes of rapport building. Ex. A at 0:00-39:00. Throughout this period, Mr. Kelley's communications exhibited a lack of sophistication marked by rampant non sequiturs and nonsensical statements. His demeanor remained

inappropriately relaxed as if he was among friends. The fact that he was being investigated for murder seemed not to register.

When advised of his rights and asked if he would be willing to answer agents' questions, his response was unintelligible. Ex. A at 48:40. But his interrogators disregarded his nonsensical response and forged ahead. In that moment, Mr. Kelley's will was overborne by the circumstances CID had put in place and their ignorance of or disregard for his lack of understanding. Not only did he believe he had no choice but to answer questions, he expressed no meaningful understanding of his option not to; precisely the risk military courts acknowledge is inherent in the interrogation of soldiers. Conditioned to obey from the first day of basic training, a soldier asked for a statement about his own conduct feels an obligation to speak. *United States v. Ravenel*, 26 M.J. 344 (C.M.A. 1988) ("a subordinate military person's obligation to respond to the command of his superior" creates an "inherent tendency of that relationship, either directly or subtly, to induce an accused to respond to a question by the superior."). When directed by his command to a CID building, any feeling that he is free to remain silent melts in the sunlight of the reality that his commander did not send him to CID

to obstruct the investigation. A directive to an unsophisticated soldier under the circumstances Mr. Kelley faced was equivalent to a directive for him to answer agents' questions. If CID agents were going to correct such a misunderstanding, it was not by ignoring Mr. Kelley's incoherent response when asked if he was willing to speak with them. Put simply, CID created an environment where Mr. Kelley did not believe or understand that he could remain silent. And when he exhibited signs of that misunderstanding, agents looked the other way and let him speak.

### B. The August 8 statements, as a result of Government coercion, were neither voluntary nor knowing and intelligent.

Following the coercive March 19 interrogation, on August 8, Mr. Kelley again made statements to CID. This time, he was familiar with the process: chitchat, sign some papers, and answer the Army's questions. Mr. Kelley was going to speak with CID regardless of any rights, not because he wanted to but because the circumstances caused him to believe he had no choice. After all, when he demonstrated confusion over the question about his willingness to speak on March 19, the interrogation train rolled on. Why would it not on August 8?

Moreover, the environment on August 8 was hostile. Not only were agents overtly accusing him of murder, but their presentation looked much more like basic training than an environment affording choice. When it came time to ask Mr. Kelley if he was willing to answer agents' questions once again, sufficient authority had been exercised over his body and his autonomy that it was reasonable for him to conclude, as he had on March 19, that his participation in the conversation would not be optional. Once again, the coercive environment prevailed, and Mr. Kelley answered agents' questions.

## REQUEST FOR RELIEF

Mr. Kelley respectfully asks the Court to:

1. Hold an evidentiary hearing on the voluntariness of his March 19 and August 8, 2025, waivers and ensuing statements;
2. Suppress statements Mr. Kelley made on both dates as involuntary as a result of coercive interrogation, and all fruits of those statements, unless the Government proves at a hearing that his waivers and statements were knowing, intelligent, and voluntary;
3. Permit Mr. Kelley leave to move to suppress additional statements not yet disclosed to him;

4. And grant other relief the Court deems necessary.

## EXHIBITS

**A.** Video Recording, Interview of Brandon Kelley (Mar. 19, 2025)

**B.** Rights Waiver of Brandon Kelley (Mar. 19, 2025)

**C.** Video Recording, Interview of Brandon Kelley (Aug. 8, 2025)

**D.** Rights Advisement Form of Brandon Kelley (Aug. 8, 2025)

**E.** Certificate of Release or Discharge from Active Duty (DD Form 214), Brandon M. Kelley (July 2020)

**F.** U.S. Army Orders, Brandon M. Kelley (Nov. 5, 2024, effective Oct. 7, 2024).

**G.** Search Warrant Package for Cellphones

**H.** Search Warrant Package for Vehicle

**I.** CID Investigative Summary "Exhibit 40" (Mar. 19, 2025)

/s/ *Michael A. Schwartz*
MICHAEL A. SCHWARTZ
Georgia Bar No. 966017
/s/ *Karin Kissiah*
KARIN KISSIAH
Georgia Bar No. 263172
New South Law, LLC
1305 Barnard St. #203
Savannah, Ga. 31401
(912) 581-1999
Counsel for Brandon Kelley

## CERTIFICATE OF SERVICE

I certify that I have on this day served the foregoing document on all parties via the notice generated by electronic filing in this Court, this 24th day of August 2026.

/s/ *Michael A. Schwartz*
MICHAEL A. SCHWARTZ
Georgia Bar No. 966017