**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 4:25-CR-93-1** |
| | ) | |
| **BRANDON MITCHELL KELLEY** | ) | |

# BRANDON KELLEY'S MOTION TO SUPPRESS CELLPHONES

Defendant Brandon Kelley respectfully moves, pursuant to the Fourth and Fifth Amendments and Federal Rule of Criminal Procedure 12(b)(3)(C), to suppress all evidence obtained from the seizure and search of the two cellphones identified in the March 18, 2025, revised warrant in *In the Matter of the Search of Certain Premises for the Cellphones of Brandon Kelley and Stacey Kelley*, No. 4:25-MJ-25-CLR, as well as any searches of his vehicle, together with all fruits of those searches. Mr. Kelley separately moves to suppress the fruits of the warrantless "full file extraction" of his cellphone, which the Government obtained through involuntary consent. The revised cellphone warrant was a modern general warrant. During the critical period, it authorized the seizure of "[a]ny and all data, without limitation as to subject matter or category." It imposed no meaningful time limit, and the supporting affidavit established no nexus between the phones and the charged offenses. It also authorized officers to compel biometric access from "any individual" present. The good-faith exception cures none of these defects.

The government planned the search of Brandon Kelley's cellphone before it sought his consent. Search warrant package 4-25- MJ-25-CLR - KELLEY Phones (Ex A). ¶ 41. In his affidavit in support of the search warrant application, an Army CID agent explained that the operation would commence with Mr. Kelley's unit directing him to report to an Army CID

building. *Id.* Once there, agents advised the junior-enlisted soldier that he was suspected of murder, questioned him, obtained what CID recorded as consent to a "full file extraction" of his personal cellphone, seized the device, and gave him copies of the warrants during the same encounter. Ex A at ¶ 41; IA Interview of B. Kelley - 19 Mar 25 (Ex B).

The warrant does not rescue the consent, and the consent does not rescue the warrant. Consent has independent force only if it reflected a free choice rather than submission to asserted authority. *Bumper v. North Carolina*, 391 U.S. 543, 548-50 (1968). The warrant, meanwhile, authorized the government to seize "[a]ny and all data, without limitation as to subject matter or category" for the entire 38-day window the affiant selected. Revised Cellphone Warrant, attach B ¶ 5 (Ex A). The affidavit justified that breadth through a "pattern of life" theory and concluded that "all such information, by its nature, constitutes evidence of the crimes under investigation." Ex A at ¶ 47. But the theory the affiant actually articulated identified time-stamped location, navigation, call, message, photograph, browser, search, and application-usage records capable of showing what the Kelleys were doing. *Id*. It did not establish probable cause to read and retain every private message, photograph, note, financial record, third-party medical record, and privileged communication created during the period.

This motion keeps those issues in their proper order. First, to use the contents of Mr. Kelley's phone against him, the government must prove that he voluntarily authorized a full extraction after being commanded to CID and confronted with a warrant-backed murder investigation.

Second, the all-data clause in Attachment B ¶ 5 is a general warrant whose breadth exceeded the probable cause offered to support it, and it must be severed.

Third, the vehicle warrant must be narrowed to the movement data supported by its stated probable-cause theory.

Fourth, the warrant was temporally overbroad. Its start date rested on a speculative estimate of conception, and its end date remained open until "the date of the forensic analysis."

Fifth, the supporting affidavit failed to establish a nexus between these phones and the charged offenses.

Sixth, the provision authorizing officers to compel biometric access from "any individual" present violated the Fourth and Fifth Amendments.

And, finally, the Government must disclose how the warrants were executed so the Court can determine whether targeted suppression is sufficient or whether officers treated the warrants as general licenses to search.

**FACTS**

Vyolet Kelley died on November 22, 2024, seven weeks after her birth. Army CID opened an investigation that night. Ex A at ¶ 8. SA Otilio Rivera was the affiant on all three warrants at issue and personally conducted both digital reviews. Ex A; search warrant package 4-25-MJ-25-CLR - KELLEY vehicle data (Ex D); B. KELLEY Tag Text Messages (Ex E); IA Digital Analyzation of S. KELLEY (Ex F).

Nearly four months later, Rivera sought three federal warrants under miscellaneous case number 4:25-MJ-25-CLR: a vehicle-data warrant and a cellphone warrant issued on March 14, 2025, and a revised cellphone warrant issued on March 18, 2025. Search warrant package 4-25-MJ-25-CLR - KELLEY cellphones at 1 (Ex G);  Ex A; Ex D; at 1. Each package was filed under seal on the government's motion.

The vehicle warrant authorized forensic extraction of the infotainment and telematics modules in Mr. Kelley's white 2015 Chevrolet Silverado 1500. Attachment B authorized seizure of "All electronically stored information" on those systems created from October 15 through October 19, 2024, "including, but not limited to" twenty-eight enumerated items. Vehicle Warrant, attach. B ¶ 1.a.i–xxviii (Ex. C). The enumerated items include track logs, stop/start logs, GPS warnings, historical navigation and speed data, historical event data, hard acceleration and braking, light status, odometer readings, and gear shifts. *Id.* They also include SMS, call logs, contacts, media files, voice recordings, voice calling, web browser history, Wi-Fi and Bluetooth and USB connections, speech recognition, and "data streaming services and related content." *Id.*

The affidavit offered a focused reason to seek travel data. Mayo Clinic personnel had directed the Kelleys to "stop every 1.5 hours to get V. KELLEY out of the car seat for air and to stop every 3 hours for feeding." Vehicle Aff. ¶ 27 (Ex. C). Rivera ran a Google Maps query indicating the trip "would have taken approximately 18 hours and 35 minutes, not accounting for traffic, stops for bathroom, gas or meal breaks," and reasoned that if the Kelleys complied "their travel time would have been substantially longer." *Id.* ¶ 39.

For retention and capability, the affidavit stated only that SSA Keyomine Townsend, a digital forensic examiner, "confirmed that the Vehicle is equipped with infotainment and telematics systems." *Id.* ¶ 40. It did not state that this particular 2015 system retained five-month-old track logs, stop records, or historical navigation. The supporting technical discussion is generic, describing what "many modern motor vehicles" are equipped with and noting that "the computers (ECUs) within many motor vehicles store data for prolonged periods of time." *Id.* ¶¶ 41, 41(a), 41(g).

The jurat states that the affidavit was "Subscribed and sworn to by telephone on March 13, 2025," although the application is dated March 14, 2025 and the warrant issued March 14, 2025 at 3:12 p.m. *Id.* at 31.

The revised cellphone warrant authorized searches of Mr. Kelley's person, Stacey Kelley's person, the Silverado, and the family residence at 7529 Fedala Street, Apartment B. Ex A, attachs. A-1 through A-4. It authorized seizure and search of two cellular devices identified by assigned call number. *Id.*, attach. B ¶ 1.

Attachment B used two overlapping windows. The first, at paragraph 4, ran from January 24, 2024 (the affiant's estimate of the date of conception) "through the date of the forensic analysis of the Target cellphones." It listed ten lettered categories, subparagraphs (a) through (j), concerning the pregnancy, the parents' thoughts and feelings, their own condition, Vyolet's physical condition, her eating and sleeping patterns, photographs and videos of her, childcare research, childcare shopping, her death and the resulting investigations, and user attribution. Ex Aa at ¶¶ 3-4.

The second window, at paragraph 5, covered thirty-eight days from October 16 through November 22, 2024, inclusive. For that period the warrant authorized "Any and all data, without limitation as to subject matter or category." *Id.*, attach. B ¶ 2. Because the periods overlap, the all-data clause nullified the ten categories during the period the affiant himself identified as decisive.

Paragraph 47 of the affidavit is the only paragraph directed at that clause. It states that "this paragraph is designed to articulate probable cause . . . to search all data on the Target Cellphones, without limitation as to subject matter or category," because cellphones record "diverse, time-stamped data as location, navigation, phone calls made and received, text message

communications, pictures taken, videos recorded, internet usage, browser history, search history, application usage, and so on," which "can allow investigators to build out a detailed timeline of an individual's activities, sometimes referred to as a pattern of life." It concludes that "all such information, by its nature, constitutes evidence of the crimes under investigation." Ex A at ¶ 47.

The affidavit elsewhere acknowledged that examining the phones may require "computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant." *Id.* ¶ 52. It specified no search terms, filter protocol, minimization method, or privilege review. *Id.* ¶¶ 50–53.

To connect the phones to the investigation, the affidavit relied principally on generalized assertions that "parents of newborn and infant children, and those who are expecting, frequently use cellphones" to communicate, take photographs, and conduct internet research and shopping (*id.* at ¶ 44), and that "those who have jointly perpetrated a crime frequently use cellphones" to communicate about the offense and investigation and to "conduct internet research into laws that might be implicated by their conduct" (*id.* ¶ 46). And, the affidavit identified only a handful of device-specific facts: that Stacey Kelley exchanged Facebook Messenger messages with a nurse, Kristia Carver; that, per Stacey Kelley, Brandon Kelley "researched V. KELLEY's symptoms on S. KELLEY's Cellphone"; and that Stacey Kelley sent a text message to Brandon Kelley from the hospital waiting room. *Id.* ¶¶ 10, 12, 18-22.

Attachment B also authorized agents, during execution, to "press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises," and to hold a device

found at the premises "in front of the face" of those same individuals to activate facial recognition, in order to unlock the device. Ex Aa, attach B ¶ 2; Cellphone Aff. ¶ 54.

The affidavit prescribed how agents would obtain the devices:

> I bring this application in preparation for an operation to be conducted during the week of March 17, 2025, in which I, assisted by other law enforcement personnel, will attempt to conduct simultaneous or near-simultaneous interviews of B. KELLEY and S. KELLEY. The operation will commence with B. KELLEY being directed by his command to report to a DACID building on Fort Stewart." Stacey Kelley, a civilian, "will be contacted via telephone and requested to come to a DACID building," with agents attempting contact at the Residence if she declined.

Ex A at ¶ 41.

The government followed that plan on March 19. Mr. Kelley's command directed him to report to CID. At 9:23 a.m., agents advised him of his rights "for the offense of Murder, which he waived," and recorded an interview. Ex. B at 1. During the encounter he "provided consent to conduct a full file extraction of his cell phone." *Id.* His phone was collected and documented on Evidence Property Custody Document E1KAB. Then, in the report's narrative sequence, "SA DOWLING provided S/B. KELLEY with a copy of the search warrants." *Id.* He was also processed for fingerprints, a CODIS kit, and mugshots. *Id.*

Rivera reviewed Mr. Kelley's extraction on April 16, 2025, twenty-eight days after seizure. The report identifies no search terms, filter process, minimization procedure, or independent privilege reviewer. Its sole enclosure is an "Excel/PDF Extract of S/B. KELLEY's cellphone." Ex E. The returns do not disclose what the agents seized, when they executed the searches, or whether they honored the warrants' limits, although the record independently makes it clear they did not. Rivera tagged material ranging from Mr. Kelley's video-game activity and Xbox profile to paternity leave, enlistment paperwork, birth certificates, financial and housing

assistance, household packing, and Stacey Kelley's post-caesarean care. IA Digital Analyzation of B. Kelley Cellphone (Ex H). Much of that material falls within the thirty-eight-day window but does not appear to fit within any of the ten crime-related categories. *Compare* Ex H *with* Ex A.

Rivera reviewed Stacey Kelley's extraction on May 13, 2025, fifty-five days after seizure. Ex F. That report likewise identifies no search terms, filter, minimization procedure, or privilege reviewer, and its sole enclosure is a set of tagged messages rather than a full extract. *Id*. He tagged an October 15, 2024, exchange outside the all-data window in which she told two friends about a difficult night and day; one responded, "Y is that?" *Id*. at 1. He tagged messages inside the window about who would pay for a hotel room and about Mr. Kelley's gaming. *Id*. at 2-4. He also summarized private conversations with at least nine friends and acquaintances about the move, packages, finances, and her surgical recovery. *Id*. at 1-5.

The tagged extractions confirm that the search reached far outside the charged window. The tagged Facebook Messenger messages from Mr. Kelley's device span September 26, 2024, through January 20, 2025. Of the 700 tagged messages, two predate Vyolet's birth, 276 fall in October 2024, 403 in November 2024, and 19 in January 2025, roughly two months after her death. Ex H. The January 2025 messages tagged as "evidence" include exchanges about joining "the gym," visiting "tattoo places," and servicemember life-insurance benefits, none of which relates to Vyolet or the charged conduct. *Id*. The messages reviewed from Stacey Kelley's device likewise begin on October 5, 2024, before both the all-data window and the charged period. Ex F.

Because the first tier ran to "the date of the forensic analysis," and because the two analyses occurred on different dates, the searchable period under a single warrant closed on April 16 for one device and May 13 for the other. Ex A at ¶ 4; Ex H; Ex F.

The search warrant return page in the vehicle package and in the revised cellphone package is blank. Neither identifies an execution date, an inventory, or an officer's certification. Ex D at 2; Ex A at 2.

## ARGUMENT

### I. The government must prove that Mr. Kelley's "full file extraction" consent was voluntary and independent of the asserted warrants.

A phone holds "the privacies of life." *Riley v. California*, 573 U.S. 373, 403 (2014). A warrantless search of its contents therefore requires a recognized exception, and the government bears the burden of proving one. Consent qualifies only if it was the product of an "essentially free and unconstrained choice," not coercion or submission to authority. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-27, 248-49 (1973); *United States v. Yeary*, 740 F.3d 569, 581 (11th Cir. 2014).

*Bumper* supplies the controlling distinction. When officials announce that they already possess legal authority to search, an occupant's ensuing permission is not a free choice; it is acquiescence to a search the person has been told will happen anyway. 391 U.S. at 548-50. A signed form does not cure that problem, because the government must prove consent "in fact," not merely a signature. *Id.* at 548.

The known circumstances require a hearing. Mr. Kelley did not voluntarily walk into a police station. His military command directed him to report to CID, pursuant to an operational plan the affiant had described to the magistrate five days earlier. Ex A at ¶ 41. At least three agents were involved. He was advised he was suspected of murder, questioned under a rights

waiver, fingerprinted, swabbed for CODIS, and photographed. Agents concluded that Mr. Kelley consented to a full file extraction, seized his phone, and handed him warrants allowing the search of the phone, all during the same encounter. Ex B at 1-2.

The report alone does not answer the constitutional question. It records when Agent Dowling handed over a paper copy; it does not record when agents first asserted, described, displayed, or relied on the warrants to break the junior soldier's resistance. Nor does a waiver of rights governing interrogation establish consent to search. *Schneckloth* treats search consent as a separate factual inquiry, 412 U.S. at 227, and *Bumper* requires the Court to determine whether the asserted warrant left any real choice, 391 U.S. at 548-50.

If the agents told Mr. Kelley, expressly or by clear implication, that they already had authority to seize and search the phone, the consent added nothing. If they sought consent without invoking the warrants, the Court must still assess the command-directed setting, the murder advisement, the number and conduct of the agents, whether Mr. Kelley was told he could refuse, the timing, and the wording of the form. *See United States v. Blake*, 888 F.2d 795, 798-99 (11th Cir. 1989).

**II. The all-data clause violated the Fourth Amendment because its breadth exceeded the probable cause offered to support it.**

The Fourth Amendment requires the warrant itself to identify what may be seized and to confine the officers' discretion. *Groh v. Ramirez*, 540 U.S. 551, 557–58 (2004). Particularity asks whether the warrant clearly identifies the things sought; breadth asks whether the authorized seizure extends no farther than the probable cause supporting it. *United States v. McCall*, 84 F.4th 1317, 1327 (11th Cir. 2023). Both rules prevent "general, exploratory rummaging." *United States v. Wuagneux*, 683 F.2d 1343, 1348-49 (11th Cir. 1982).

Digital warrants may be narrowed by subject matter or time. *McCall*, 84 F.4th at 1327-28. A tailored temporal limit can be especially useful because it excludes data unconnected to the investigated period. *Id.* But a date range does not automatically establish constitutional breadth. The range must remain tied to the probable-cause theory, and the categories seized within it may not outrun what that theory makes fairly probable. *Id.*

Attachment B failed at that step. For January 24, 2024, through the eventual analysis date, the government drafted ten lettered categories tied to the pregnancy, the child's condition, her feeding and sleeping, images of her, childcare research and purchases, the death and its investigation, and user attribution. Ex A at ¶ 4(a)–(j). For the nested thirty-eight-day window, it authorized "[a]ny and all data, without limitation as to subject matter or category." *Id.* ¶ 5. That language gave the examiner no criterion for distinguishing seizable from non-seizable information. Everything qualified because it existed during the window.

The affidavit's "pattern of life" explanation does not justify a search of everything he might find, and the affidavit says so plainly. Paragraph 47 identifies the data types that would build a timeline: location, navigation, calls, messages, pictures, videos, internet usage, browser history, search history, and application usage. Records of that kind could show what the Kelleys were doing with their time. But the paragraph then leaps to the conclusion that "all such information, by its nature, constitutes evidence of the crimes under investigation." Ex A at ¶ 47. It does not follow that the substantive content of every message, every photograph unrelated to Vyolet, every note, every financial record, every third party's medical information, and every privileged communication supplied evidence of neglect. Temporal proximity is not probable cause for content unrelated to the alleged course of conduct.

The first window proves that narrower drafting was feasible. The same affiant identified the suspected offenses, the people, the subjects, and the types of information. He then abandoned those limits for the window where he believed the evidence was most likely to be found. The categories thus create the appearance of tailoring while doing no work during the decisive period. In *McCall*, the government conceded that a cloud-account warrant allowing a search of "all the conceivable data on the account without any meaningful limitation" fell short of the particularity requirement, and the Eleventh Circuit assumed the warrant was overbroad; only the good-faith exception, not the warrant's validity, saved the evidence. 84 F.4th at 1328. Even so, the warrant there at least confined the search to seven enumerated categories tied to the crime under investigation. *Id*. at 1328-29. The clause at issue here is broader on its face: it names no category at all and candidly disclaims every subject-matter and category limit.

The Eleventh Circuit has twice condemned digital warrants of this breadth. In *United States v. Blake*, warrants requiring disclosure of "virtually every type of data" in an account, untethered to "the period of time during which" the suspect was involved in the crime, were "the internet-era version of a 'general warrant.'" 868 F.3d 960, 974 (11th Cir. 2017). The cure, the court explained, was to limit the search to communications "sent to or from persons suspected at that time" of involvement and to request "data only from the period of time during which" the suspect was engaged in the offense. *Id*. Paragraph 5 attempts neither limit. As one court held of a materially indistinguishable "any and all" cellphone warrant, such an instrument leaves "no valid portions" to save. *United States v. Winn*, 79 F. Supp. 3d 904, 919-21 (S.D. Ill. 2015).

The government's own review report confirms that the clause worked as written. The examiner tagged nine dates of video-game chatter, another child's birth-certificate paperwork, a

hotel bill, and a housing inquiry. Ex H. None of that is evidence of nutritional deprivation. All of it was seizable under paragraph 5, and nothing else in the warrant authorized it.

### III. The motion does not depend on an ex ante search protocol, but execution evidence matters to scope and remedy.

Mr. Kelley does not ask the Court to constitutionalize a list of search terms or a specific forensic protocol. The Eleventh Circuit permits a two-step digital process in which data is collected and then sorted, and it does not require the warrant to prescribe the examiner's methodology. *McCall*, 84 F.4th at 1326-27. Some relevant content can be identified only by opening and reading files. *See United States v. Blake*, 868 F.3d 960, 973-74 (11th Cir. 2017).

But the absence of a protocol cannot cure an invalid seizure clause. Authorization to inspect broadly while locating described evidence differs from authorization to retain and use every item inspected. Rule 41 recognizes that distinction by permitting seizure or copying of electronic media for later review, Fed. R. Crim. P. 41(e)(2)(B), while the Fourth Amendment still requires the warrant to identify the evidence ultimately seizable. Here paragraph 52 explained why agents might need to expose many files to inspection; Attachment B paragraph 5 separately allowed them to seize every file. The former practical necessity does not justify the latter legal breadth.

### IV. The warrant's temporal scope is unconstitutionally overbroad.

The first tier ran "through the date of the forensic analysis of the Target cellphones." Ex A at ¶ 4. That endpoint expanded with government delay, and it expanded unevenly: the analysis of Mr. Kelley's phone occurred on April 16, 2025, and the analysis of Stacey Kelley's on May 13, 2025. Ex H; Ex F. One warrant therefore authorized two different searchable periods, each fixed after the fact when a warrant should define its reach when issued.

The Eleventh Circuit's "preferred method" of particularizing a digital search is a meaningful temporal limitation. *McCall*, 84 F.4th at 1328. Both of Attachment B's periods defeat it. The open-ended end date is not a temporal limitation at all. A limit running "through the date of the forensic analysis" has no fixed endpoint and expands to whatever future date the government elects to search. The court favors time-based limits precisely because "data is often created or uploaded at an ascertainable date and time," so that "it will usually be possible to segregate that data before conducting a search." *Id*. Even genuine uncertainty about the relevant dates "is not a license to give no date at all," and front-end temporal limits are "usually feasible" for this kind of data. *United States v. Liburdi*, No. 8:24-CR-564-KKM-TGW, 2026 WL 369393, at *9 (M.D. Fla. Feb. 10, 2026).

The January 24, 2024 start date fares no better, because it corresponds to no investigative fact. The affiant generated it by "subtracting 37 weeks from" Vyolet's birth date to estimate conception. Ex A at ¶ 47. A window anchored to an estimated date of conception sweeps in roughly nine months of the Defendants' private communications, photographs, browsing, and shopping predating any alleged criminal conduct.

Both periods also dwarf the charged offenses. The indictment charges conduct "[f]rom on or about October 26, 2024, to on or about November 22, 2024," a span of twenty-eight days. Doc. 3. The all-data period begins ten days earlier, and the categorical period begins roughly nine months earlier and never ends. A warrant should request "data only from the period of time during which" the suspect is "suspected of taking part in" the offense. *Blake*, 868 F.3d at 974.

The manner of execution proved the danger real rather than theoretical. Because the end date floated to the analysis dates of April 16 and May 13, 2025, the authorized reach expanded to nearly sixteen months. The Fourth Amendment independently requires execution within a

reasonable time, "measured in terms of the continued existence of probable cause." *United States v. Hernandez*, 167 F.4th 1113, 1126 (11th Cir. 2026). The defect here is not delay in the abstract; it is that the Warrant tethered its substantive scope to the date of the later review, so the government's own delay enlarged the universe of data it could search. Rule 41(e)(2)(B) authorizes only "a later review of the media or information consistent with the warrant," Fed. R. Crim. P. 41(e)(2)(B), and a review reaching post-death gym, tattoo, and life-insurance messages is not consistent with a warrant for evidence of child abuse.

**V. The affidavit fails to establish the required nexus between the offenses and these particular cellphones.**

Even setting overbreadth aside, the affidavit does not establish probable cause to search the phones, because it does not supply the required nexus between the charged crimes and these particular devices. A warrant "must demonstrate cause to believe that evidence is likely to be found at the place to be searched," and there must be "a nexus . . . between the item to be seized and criminal behavior." *United States v. Griffith*, 867 F.3d 1265, 1271-72 (D.C. Cir. 2017). Because "a cell phone, unlike drugs or other contraband, is not inherently illegal, there must be reason to believe that a phone may contain evidence of the crime." *Id*. at 1274.

The affidavit rests that nexus principally on generic training and experience, namely that parents and expecting parents "frequently use cellphones" (Ex A at ¶ 44), and that co-perpetrators "frequently use cellphones" to discuss crimes and research the law, (*id*. ¶ 46). Courts have repeatedly rejected exactly this move. "[T]he ubiquity of cellphones does not, by itself, form the requisite nexus to search the device"; "something more in the way of case-specific evidence must nudge training and experience across the finish line." *United States v. LaCosta-Franco*, 828 F. Supp. 3d 543, 547-48, 558 (E.D. Pa. 2026). The affiant's generalizations describe conduct indistinguishable from that of any ordinary parent. Communicating, photographing a

child, researching childcare, and shopping for diapers are not markers of criminality. The D.C. Circuit rejected the identical logic in *Griffith*, refusing to accept "that because nearly everyone now carries a cell phone," suspicion of a crime "justifies searching" any phone. 867 F.3d at 1275-76.

The affidavit's few device-specific facts do not fill the gap for the sweeping search authorized. At most they show that Stacey Kelley messaged a nurse about the child's symptoms, that Brandon Kelley once used Stacey Kelley's phone to research symptoms, and that Stacey Kelley texted Brandon Kelley from the hospital. Ex A at ¶¶ 10, 12. Those facts describe parents seeking and exchanging information about a sick infant, conduct as consistent with innocence as with guilt, and at most might support a narrow, subject-matter-limited search. They do not justify seizing "[a]ny and all data" or nine-plus months of the Kelley's digital lives. *LaCosta-Franco*, 828 F. Supp. 3d at 558-59.

## VI. The vehicle warrant established a nexus to movement records, not to every category it listed.

Probable cause requires a fair probability that evidence of the identified crime will be found in the particular place searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Rivera supplied a logical nexus between the discharge instructions and records showing when and where the Silverado stopped during the drive. Vehicle Aff. ¶¶ 27, 39 (Ex. C). That nexus supports movement and event data if the system retained it.

The affidavit did not establish the same nexus for the remaining categories. Contact lists, SMS content, media files, voice recordings, voice calling records, and web browser history do not show whether the Silverado stopped every ninety minutes or whether Vyolet was fed every three hours. Vehicle Warrant, attach. B ¶ 1.a.iii–xi (Ex. C). The affidavit's only statement about these categories is a generic observation that infotainment systems "support the importation of

content" from a user's mobile device. Vehicle Aff. ¶ 41(f). Nor did Townsend's confirmation that the vehicle "is equipped with infotainment and telematics systems" establish that this 2015 system retained the sought historical data five months later. *Id.* ¶ 40. Generic statements about what "many modern motor vehicles" record do not answer what this vehicle retained. *Id.* ¶ 41.

The breadth problem is also structural. Attachment B does not limit the seizure to the twenty-eight enumerated items. It authorizes "All electronically stored information" on the two systems for the five-day period, "including, but not limited to" that list. Vehicle Warrant, attach. B ¶ 1 (Ex. C). Like paragraph 5 of the cellphone warrant, that formulation supplies no criterion of exclusion; the enumeration illustrates rather than confines.

The Court need not invalidate the entire vehicle warrant. It should sever the unsupported content categories and the "not limited to" language, and suppress evidence obtained solely through them. It should also require testimony or technical evidence establishing what agents knew about this vehicle's retention capabilities when Rivera applied.

## VII. *Leon* does not permit the affiant-executor to rely on an unlimited clause he drafted himself.

The good-faith exception protects an officer's objectively reasonable reliance on a warrant. It does not protect reliance on a warrant "so facially deficient" in describing the place to be searched or the things to be seized "that the executing officers cannot reasonably presume it to be valid." *United States v. Leon*, 468 U.S. 897, 923 (1984). The test asks what a reasonably well-trained officer would have known under all the circumstances. *United States v. Martin*, 297 F.3d 1308, 1318 (11th Cir. 2002).

*Groh v. Ramirez* establishes the rule. An officer who drafts a warrant that fails to describe the things to be seized cannot rely on the magistrate's approval because "no reasonable officer could believe that a warrant that plainly did not comply with [the particularity] requirement was

valid." 540 U.S. 551, 563-65 (2004). An officer who drafts a defective warrant cannot take shelter in the signature he secured for it. *Id*. at 563.

The all-data clause is just such a defect. Paragraph 5 authorized the seizure of "any and all data, without limitation as to subject matter or category." Ex A at ¶ 5. A warrant authorizing the seizure of everything is a modern general warrant. The problem is not ambiguity. The clause expressly disclaims any limit. Rivera did not misread an unclear warrant; he read an unambiguous grant of unlimited authority. See *Groh*, 540 U.S. at 563-65.

*McCall* does not support the government. Its contrasting facts show why. The Eleventh Circuit assumed that the cloud-account warrant was overbroad but applied the good-faith exception because of safeguards absent here. The detective was seeking his first cloud warrant and consulted both supervisors and an assistant state attorney. 84 F.4th at 1328-29. The warrant limited the search to seven crime-related categories. *Id.* And the account contained only about two and a half months of data. *Id*. Even with those safeguards, *McCall* identified the constitutional defect: the warrant "allowed a search of all the conceivable data on the account without any meaningful limitation," which "fell short of the particularity requirement." *Id*. at 1328.

Paragraph 5 is worse on each point *McCall* found mitigating. Rivera was not a first-time applicant relying on more experienced judgment. He drafted Attachment B, wrote the affidavit paragraph requesting unlimited authority, executed the search, and personally examined both devices. Ex A at ¶ 47; Ex F. And while the *McCall* warrant at least identified seven categories of data, paragraph 5 identifies none.

Nor does paragraph 5's thirty-eight-day window provide the limitation that mattered in *McCall*. *McCall* favored temporal limits because restricting a search to data "created or uploaded

during a relevant time connected to the crime" helps particularize the search and prevents rummaging. But the court cautioned that the circumstances "may require that a sufficiently particular warrant include a subject-matter limitation." 84 F.4th at 1327-28. The window here still authorized the seizure of every private message, photograph, financial record, third-party medical record, and privileged communication created during those thirty-eight days. It limited the calendar, not the subject matter. And subject matter, not dates, was what the pattern-of-life theory failed to justify. No reasonable officer could believe that a date range cured a clause expressly disclaiming every other limit.

The affidavit's structure confirms the point. The same affiant who drafted ten crime-related categories in paragraph 4 declared in paragraph 5 that neither subject matter nor category would limit the search during the decisive window. He then told the magistrate that "all such information, by its nature, constitutes evidence." Ex A at ¶ 47. Rivera thus showed that he knew how to limit a warrant and deliberately chose not to do so.

The magistrate's approval cannot cure that choice. Otherwise, *Leon*'s facial-deficiency exception would mean nothing whenever the officer who drafted the unlimited language also obtained the magistrate's signature. An officer capable of drafting ten crime-related categories could not reasonably believe that the phrase "without limitation as to subject matter or category" satisfied the Fourth Amendment.

Good faith is independently unavailable because the agents did not act "within [the] scope" of the Warrant when they tagged as evidence data outside its categories and time windows. *Brown*, 125 F.4th at 1207 (the exception applies only when an officer "acted within its scope," and does not apply "when officers fail to comply with express limitations in the

warrant"). As shown above, the review reached post-death messages about the gym, tattoos, and life-insurance benefits that fall within none of Attachment B's authorized categories.

VIII. **Severance and targeted suppression are the minimum remedy, and total suppression is warranted where the warrant has no valid portion and the agents acted in flagrant disregard of its limits.**

When officers act outside a warrant's valid boundaries, the ordinary remedy is suppression of the evidence obtained outside them. *United States v. Hendrixson*, 234 F.3d 494, 497 (11th Cir. 2000). A valid portion may be severed from an invalid portion when the provisions are meaningfully distinguishable. *See United States v. Taylor*, 935 F.3d 1279, 1292-93 (11th Cir. 2019).

The Court can perform that work and should sever Attachment B paragraph 5 and suppress any evidence whose only asserted authority is the all-data clause. The government's own review reports identify the category. On Stacey Kelley's phone, the hotel-payment and gaming messages fall within the thirty-eight days but outside the ten specified subjects. Ex F at 2-4. On Mr. Kelley's phone, the nine dates of gaming messages, the hotel-bill request, the housing inquiry, the packing message, and the material concerning his other children's paperwork and Stacey Kelley's surgical recovery fall in the same category. Ex H at 1–4. As to each proposed item, the government should identify the clause authorizing it. If an item fits a valid category supported by probable cause, severance preserves it. If it depends only on paragraph 5, suppression follows.

Blanket suppression is reserved for a search executed in flagrant disregard of the warrant, when officers exceed any reasonable interpretation and use the warrant as general authority to take what they like. *Wuagneux*, 683 F.2d at 1354. This record raises that question. The enclosure to the report on Mr. Kelley's phone is an extract of the phone rather than a set of responsive

items. Ex H at 5. If the extraction records show that the entire device was retained and browsed without any effort to separate responsive from nonresponsive data, the Court may suppress the entire extraction. If not, targeted suppression remains the appropriate minimum relief.

### IX. The blank returns require disclosure and support a hearing, although they are not a standalone basis for exclusion.

Rule 41 required the executing officer to prepare and verify an inventory and promptly return the warrant and inventory to the magistrate judge. Fed. R. Crim. P. 41(f)(1)(B), (D). The return pages in the vehicle and revised cellphone packages are blank. Ex D at 2; Ex A at 2. A ministerial defect of that kind does not ordinarily require suppression absent prejudice or deliberate disregard. *See United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B Jan. 1981).

Here the omission creates concrete prejudice at the suppression stage. Defendant cannot determine from the returns what was taken, when execution occurred, or whether the agents remained within the warrants. The remedy should begin with compelled production of the inventories, chain-of-custody records, extraction reports, audit logs, any search or filter terms actually used, and privilege-handling records.

## REQUEST FOR RELIEF

Brandon Kelley respectfully asks the Court to:

1. Hold an evidentiary hearing on the voluntariness, timing, and scope of the purported consent and on the execution of the cellphone and vehicle warrants;
2. Sever paragraph 5 of Attachment B to the cellphone warrants and suppress any evidence whose only asserted authority is that clause;
3. Suppress all evidence seized from the Target Cellphones, and its fruits, because the revised cellphone warrant operated as a general warrant lacking any meaningful temporal

or subject-matter limitation and rests on an affidavit that fails to establish the required nexus to these devices;

4. Sever the unsupported content categories and the "not limited to" language from Attachment B to the vehicle warrant and suppress evidence obtained solely through them;

5. Construe subparagraph 4(i) to exclude privileged communications and any material created after a constitutionally fixed endpoint, and order the return or suppression of such material;

6. Suppress the entire extraction of Mr. Kelley's cellphone if the execution record shows retention and review in flagrant disregard of the warrant's valid limits;

7. Suppress the fruits of the "full file extraction" consent unless the government proves at a hearing that the consent was voluntary and independent of the asserted warrants; and

8. Impose any other remedy the Court deems appropriate.

## EXHIBIT LIST

**Ex. A** – Search warrant package 4-25-MJ-25-CLR - KELLEY Phones

**Ex. B** – IA Interview of B. Kelley - 19 Mar 25

**Ex. C** – Search warrant package 4-25-MJ-25-CLR - KELLEY vehicle data

**Ex. D** – B. KELLEY Tag Text Messages

**Ex. E** – IA Digital Analyzation of S. KELLEY

**Ex. F** – Search warrant package 4-25-MJ-25-CLR - KELLEY cellphones

**Ex. G** – IA Digital Analyzation of B. Kelley Cellphone

Respectfully submitted this 24th day of August 2026,

/s/ Michael A. Schwartz
MICHAEL A. SCHWARTZ
Georgia Bar No. 966017
/s/ Karin Kissiah
KARIN KISSIAH
Georgia Bar No. 263172
New South Law, LLC
1305 Barnard St. #203
Savannah, Ga. 31401
(912) 581-1999
Counsel for Brandon Kelley

## CERTIFICATE OF SERVICE

I certify that I have on this day served the foregoing document on all parties via the notice generated by electronic filing in this Court, this 24th day of August 2026.

/s/ Michael A. Schwartz
MICHAEL A. SCHWARTZ
Georgia Bar No. 966017